### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| PAMELA WILSON, | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | |
|       v. | ) | |
| | ) | Case No. 1:11-cv-00471-TWP-DML |
| MICHAEL J. ASTRUE, | ) | |
| COMMISSIONER OF THE | ) | |
| SOCIAL SECURITY ADMINISTRATION, | ) | |
| | ) | |
|     Defendant. | ) | |

### ENTRY ON JUDICIAL REVIEW

Plaintiff, Pamela Wilson ("Ms. Wilson") filed this action seeking judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner") denying her application for adult child's disability insurance benefits ("DIB") under the Title II of the Social Security Act. 42 U.S.C. 416(i).   For the reasons set forth below, the Commissioner's decision is **REMANDED** for further proceedings consistent with this opinion.

### I.   BACKGROUND

Ms. Wilson was born on July 6, 1972.  (R. at 19.)  At the time of the hearing she was thirty-six years old.  She was eight years old at the time of her alleged onset date of May 1, 1980. (Pl. Br., Dkt. 17 at 3.)  As required by Section 202(d) of the Social Security Act (the "SSA"), to be entitled to child's insurance benefits as an adult, the claimant must have a disability that began before attainment of age twenty-two. (R. at 16.)  Wilson became twenty-two on July 6, 1994.  (R. at 19.)  She completed twelve years of primary school, all in special education classes with a 0.1452 grade point average.  (R. at 255B, 255D.)   However, she did not graduate from high school and has no relevant work experience.  (R. at 255D; R. at 23.)

**A.     Procedural History**

Ms. Wilson filed an application for adult child's disability insurance benefits on December 18, 2006, alleging disability beginning May 1, 1980.  (R. at 16.)  She was previously found disabled as a child and began receiving supplemental Social Security Income benefits ("SSI benefits") under Title XVI of the SSA, which she continues to receive as an adult. (R. at 16-17.)  The claim was initially denied on July 2, 2007, and upon reconsideration on January 17, 2008.  (R. at 16.)  Thereafter, on February 1, 2008, Ms. Wilson filed a written request for a hearing where she appeared and testified on November 23, 2009, in Indianapolis, Indiana before Administrative Law Judge, Peter C. Americanos (the "ALJ").  (R. at 16.)  At the hearing, the ALJ noted that although he had the authority to singularly rule on both claims, he would only focus on Ms. Wilson's Social Security benefits as it related to the adult case and would leave the reevaluation of her current SSI benefits as is until it came before his court, if at all, properly.  (R. at 258.)  On February 25, 2010, the ALJ issued his decision finding that Ms. Wilson was not disabled as defined in Section 223(d) of the SSA prior to July 6, 1994.  (R. at 24.)  On March 1, 2011, the Appeals Council denied review of the ALJ's decision.  (R. at 5.)  The ALJ's decision is therefore the final decision of the Commissioner for purposes of judicial review.

**B.     Medical History**

Virtually all of the medical records available in the transcript relate to Ms. Wilson's gynecological testing, pregnancy and hypertension evaluations during visits to various clinics and sites located in Wishard Memorial Hospital. (R. at 138-191.) However, throughout those medical reports, Ms. Wilson's doctors also provide their visual assessments of her mental inaptitude.  On July 31, 2003 while reporting that Ms. Wilson's treponemal antibody test (a syphilis test) had been found positive, Dr. Michael Weeks ("Dr. Weeks") noted that Wilson "is

2

seemingly mentally retarded." (R. at 156); *see also Definition of Test, fluorescent treponemal antibody absorbed*, MEDICINENET.COM, http://www.medterms.com/script/main/art.asp?articlekey=9846 (last visited June 25, 2012).  During that visit, specifically, Ms. Wilson was attempting to get her SSI benefit payments sent to her instead of to her mother who was the recipient at that time.  (R. at 156.)  Ms. Wilson asserted that her mother would give her all of the money in order for her to take care of her own expenses and live independently.  (R. at 156.)  Dr. Weeks further stated that Ms. Wilson had come to the hospital three months before for the same reason, and they talked about getting a social worker to evaluate her abilities.  (R. at 156.)  He, however, reported that the meeting between Ms. Wilson and the social worker likely never occurred.  (R. at 156.)

During a pregnancy check up on June 16, 2005, Dr. Terry Shelton-Graff ("Dr. Shelton-Graff") noted that the "patient [is] mentally challenged," referring to Ms. Wilson.  (R. at 151.)  Additionally, on August 29, 2006, during a gynecological exam, Ms. Wilson was described in the medical report as a "mentally retarded woman with HTN" by Dr. Burke Mamlin ("Dr. Mamlin").  (R. at 166.)  Also on August 10, 2004, it was discussed in the medical report at another routine checkup that Ms. Wilson was once again attempting to have her SSI benefit payments sent to her and not to her mother.  (R. at 155.)  In that report, Dr. Mamlin again noted that Ms. Wilson has mild mental retardation.  (R. at 155.)  Though she further writes that Ms. Wilson is able to dress herself and handle activities of daily living through repetition, she expresses reservations about her true independent functioning abilities.  (R. at 155.)  When asked "if [she] has ten dollars and buys something for three dollars and fifty cents, how much change will [she] have left?" Wilson was unable to correctly answer the question.  (R. at 155.) The doctor subsequently stated that her mother would have to agree to the change in who directly

3

received her SSI benefits check.  (R. at 155.)  On December 14, 2004, when Ms. Wilson returned

with her mother to have the SSI benefits placed in her name, Dr. Mamlin noted that "both mother

and patient are mentally challenged."

On March 16, 2007, Ms. Wilson was interviewed "face-to-face" by an interviewer for the

Social Security Administration for her Disability Report.  (R. at 95; R. at 97.)  It was noted by

the interviewer that Ms. Wilson "[c]an't write her name only prints/ very slow in answering

[their] questions/ unable to read application [they] had to read it to her then she didn't understand

other than she was filing for benefits on her daddy's record." (R. at 96.) In the section for

education and training information, Ms. Wilson states that she completed the 12th grade in 1990

and that she did not attend special education classes.  (R. at 102-03.)  However, in the section for

additional remarks, the interviewer writes that "she received special ed[ucation] classroom

setting all the way through school."  (R. at 103.)

A Psychiatric Review Technique Form was completed on July 2, 2007 by Dr. Kenneth

Neville ("Dr. Neville").  (R. at 123.)  In his report, which included over ten pages of space for

reportable data and comments, only one page, requesting the consultant's notes, was completed,

aside from the overall evaluation section which reported "Insufficient Evidence."  (R. at 123.)

His consultant's notes stated that "[n]o school records or prior folder were able to [be] obtained

in order to process the claim." (R. at 135.)

Dr. Phillip Vandivier ("Dr. Vandivier") was able to conduct a psychological evaluation of

Ms. Wilson on November 12, 2007 for the Social Security Administration in order to assess Ms.

Wilson's Mental Residual Functional Capacity ("MRFC").  (R. at 114.)  He administered the

Wechsler Adult Intelligent Scale – III which revealed a Verbal IQ of 59, a Performance IQ of 56,

and a Full Scale IQ of 53.  (R. at 116.)  Ms. Wilson also scored a 61 regarding her Verbal

Comprehension Index and a 58 in her Perceptual Organization Index.  (R. at 116.)  All of these scores conceptually place Ms. Wilson in an "extremely low" performing category.  (R. at 116.)  However, Dr. Vandivier noted that Ms. Wilson appeared passive and responded slowly to verbal and performance items with little regard for time limits and because of inconsistencies of this nature, the results might not represent the upper limits of the claimant's cognitive abilities.  (R. at 116.)  Further, he stated that she seemed to not be completely focused.  (R. at 117.)  Accordingly, he deferred his diagnosis sighting inconsistencies.  (R. at 117.)  He stated that regardless of her overall IQ score of 53 "she was able to perform a verbal generalization, she was aware of two recent news stories, she was able to identify two former Presidents of the United States, and she indicated she is capable of independent grocery shopping."  (R. at 117.)  He surmised that such tasks as well as the level of language quality Ms. Wilson displayed were not consistent with people who have such a low IQ score.  (R. at 117.)  He also noted that Ms. Wilson and her accompanying friend denied that she had major problems learning new materials and skills.  (R. at 117.)  Ms. Wilson's MRFC was subsequently deemed invalid.  (R. at 113.)

On December 26, 2007, the Social Security Administration received its Request for Medical Advice report from Dr. W. Shipley ("Dr. Shipley").  (R. at 113.)  It recommended a need for a PRTF and MRFC because the initial assessments were denied due to insufficient evidence.  (R. at 113.)  It also affirmed that "there is no evidence of psych[ological] issues before July 4, 1994 [and] current testing is invalid [and] no diagnosis given."  (R. at 113.)

At the request of Ms. Wilson, Chicago Public Schools provided a copy of her high school academic transcript on May 13, 2007.  (R. at 108–112.)  It shows that Ms. Wilson participated in relatively the same classes from her freshman year through her senior year and earned a grade point average ("GPA") of 0.1452.  (R. at 112.)  On January 15, 2009, Ms. Wilson requested and

was given additional information concerning her academic record. (R. at 255B.) The subsequent documents showed Ms. Wilson was classified as "Educable Mentally Handicapp[e]d" under special education. (R. at 255B.) It also states that she did not graduate from high school. (R. at 255D.)

On June 29, 2010, after the hearing before the ALJ, Dr. Thomas Smith ("Dr. Smith"), a clinical psychologist, provided a psychological evaluation of Ms. Wilson. (R. at 247.) Dr. Smith, using Dr. Vandivier's assessment results, compared the results of his assessment of Ms. Wilson. He surmised that Ms. Wilson was "functioning in the moderate mental retardation range" and that his "results are consistent with previous test results" conducted by Dr. Vandivier. (R. at 254.) Dr. Smith stated that Ms. Wilson "cannot understand complex concepts" and is "low functioning with regard to communication skills, use of community resources, parenting, self-direction, functional academic skills and work history." (R. at 254.) He further noted that Ms. Wilson "cannot be expected to perform tasks which require learning, other than by rote memory, comprehension, clear self-expression or judgment." His diagnosis ultimately included depressive disorder NOS, moderate mental retardation, and a Global Assessment of Functioning or GAF score (both current and highest in the past year) of 42. (R. at 254.)

## C.     The Administrative Hearing

### 1.     Ms. Wilson's Testimony

The Administrative Hearing was held on November 23, 2009. (R. at 16.) Ms. Wilson was represented by Kirsten E. Wold, Attorney at Law ("Ms. Wold"), and testified to her abilities and limitations. (R. at 258.) Ms. Wilson was eight months pregnant at the time of the hearing. The ALJ questioned Ms. Wilson about her children. She provided their names, their spelling, and each one of their ages: 16, 7, 7, 3 and 1 years old. In spelling her daughter Lolita's name,

Ms. Wilson stated "L-O-N, I think, T-I-A." (R. at 260.) She also testified that all of her children were in foster care "because she did not have a good lawyer". (R. at 262.) Her lawyer had instructed her and the father of her children to complete parenting classes and attempt to get a job in 2005, yet she was still unable to regain custody of her children. (R. at 262.) She stated that the lawyers would only make excuses regarding the likelihood of custody for her children. (R. at 262.) Notably, considering the ages of her children, in 2005 Ms. Wilson had only given birth to three of the five children who were in foster care at the time of the November 2009 hearing.

Ms. Wilson testified that she felt she was unable to work due to her learning disability. (R. at 265.) When pressed by the ALJ regarding her inability to work, Ms. Wilson confirmed that she had worked in housekeeping and restaurants, but indicated she got laid off from those jobs and because she was pregnant she did not look for additional work. (R. at 266.) When further pressed by the ALJ to assume she was not pregnant, she said she could probably work. (R. at 266.)

Ms. Wold then questioned Ms. Wilson regarding her limitations. In answering Ms. Wold's questions, Ms. Wilson stated that she worked forty hours a week during her temporary job assignments. (R. at 267.) She stopped her work assignment with the "Work Force" because they moved. (R. at 268.) She also testified she could do some reading, writing, and math. (R. at 269.) She further testified that she did not believe her learning disability had gotten worse over time. (R. at 269.)

The ALJ asked for a closing statement from Ms. Wold regarding Ms. Wilson's ability. (R. at 270.) Essentially, in a less than persuasive fashion, Ms. Wold stated that she believed Ms. Wilson should be deemed disabled. (R. at 270.) She came to this conclusion based on Ms.

Wilson's low IQ score on the reported inconsistent psychological exam conducted by Dr. Vandivier. (R. at 270.) She also took into consideration the presumption of mental impairment being constant throughout life barring injury or traumatic brain injury. (R. at 270.) When asked did she think Ms. Wilson would be disabled absent the listing, counsel replied "That's hard for me to say. I think, physically, she is well when she is not pregnant, of course. And, I do think the learning disability has certainly impeded her in terms of maintaining a lot of full-time employment". (R. at 271.) Ms. Wold, however, declined to opine on Ms. Wilson's abilities in light of Dr. Vandivier's inconsistent findings because she "[couldn't] interpret that any better than the doctor could". (R. at 271.)

### 2. Vocational Expert's Testimony

Vocational expert, Robert Barber ("the VE"), also appeared at the hearing at the ALJ's request. (R. at 271.) He classified Ms. Wilson's past relevant work experience as "light unskilled, with an SVP: 2." (R. at 271). Then he was asked if jobs at the medium and light level existed for an individual restricted to simple and repetitive tasks who must avoid reading and writing. (R. at 272.) He responded with a number of professions Ms. Wilson could perform based on that hypothetical. (R. at 87.)

## II. STANDARD OF REVIEW

In reviewing an ALJ's decision, the findings of the Commissioner as to any fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g); *Powers v. Apfel*, 207 F.3d 431, 434 (7th Cir. 2000). Thus, the question before the Court is not whether a plaintiff is, in fact, disabled, but whether the evidence substantially supports the ALJ's findings and is otherwise free from error. *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). The Supreme Court has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). In addition to requiring adequate supporting facts, the Seventh Circuit has "repeatedly stated that…the ALJ 'must articulate at some minimal level his analysis of the evidence.'" *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). "In so doing, [a]n ALJ may not select and discuss only that evidence that favors his ultimate conclusion, but must articulate at some minimum level, his analysis of the evidence to allow the Appellate Court to trace the path of his reasoning. An ALJ's failure to consider an entire line of evidence falls below the minimal level of articulation required." *Diaz v. Chater*, 55 F. 3d 300, 307 (7th Cir. 1995). In other words, so long as, in light of all the evidence, reasonable minds could differ concerning whether a plaintiff is disabled, the court must affirm the ALJ's decision denying benefits. *Sarchet v. Chater*, 78 F.3d 305, 309 (7th Cir. 1996). Under this deferential standard, courts will "reverse only if the record 'compels' a contrary result." *Borovsky v. Holder*, 612 F.3d 917, 921 (7th Cir. 2010).

## III.   DISCUSSION

### A.   The ALJ's Findings

As noted, the ALJ rendered a decision adverse to the plaintiff on February 25, 2010. (R. at 20.) He found that based on the application for adult child's insurance benefits protectively filed on October 30, 2006, the claimant was not disabled as defined in Section 223 (d) of the SSA prior to July 6, 1994, which is the date the claimant attained age 22. (R. at 24.) He also found that she had not engaged in any "substantial gainful activity" since May 1, 1980, which is the claimant's alleged disability onset date. (R. at 19.)

The ALJ affirmed that prior to attaining the age of 22, Ms. Wilson had the severe impairment of a learning disability. (R. at 19.) Yet, that impairment did not meet or medically equal one of the "listed" impairments in 20 CFR Part 404, Subpart P, Appendix 1. (R. at 19.)

His reasoning for this conclusion discussed the assessment conducted by Dr. Vandivier.  (R. at 20.)  The ALJ noted that according to Dr. Vandivier, Ms. Wilson's walking and activity were within normal levels.  (R. at 20.)  He stated that Ms. Wilson scored a full-scale IQ of 53.  (R. at 20.)  He further stated that the observational appraisals that Dr. Vandivier's evaluation discussed for Ms. Wilson were contrary to her test scores because her effort on those tests was questionable.  (R. at 20.)  The ALJ stated that Dr. Vandivier's test scores were invalid due to the inconsistencies and Ms. Wilson's lack of effort.  (R. at 20.)

The ALJ then conducted an element analysis of Ms. Wilson as it related to the requirements of Listing 12.05, the listing for Mental Retardation.  (R. at 20.) At each level, he provides specific reasoning why Ms. Wilson does not meet that element's requirement. Pointedly, he noted that Ms. Wilson was responsible for providing additional evidence to establish her claim of impairment pursuant to the criteria for Listing 12.05B because the current evidence was inadequate, referring to Dr. Vandivier's invalid report.  (R. at 20.)

The ALJ further noted that under paragraph D of the listing, Ms. Wilson had no limitation on her activities of daily living or social functioning. (R. at 21.) Specifically, he emphasized her ability to perform household chores and that she was able to care for her children prior to 2005.  (R. at 21.)  He also noted that she attends church on a regular basis and gets along with others.  (R. at 21.)

The ALJ found that Ms. Wilson has the residual functioning capacity to perform medium work.  (R. at 22.) The only limitations he discussed for her included the need to avoid work which requires reading and writing.  (R. at 22.)  She is also limited to performing simple and repetitive tasks. (R. at 22.) In making this finding, the ALJ stated that he "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with

10

the objective medical evidence or other evidence."  (R. at 22.)  He further noted that her medical findings could reasonably be expected to cause the alleged symptoms. (R. at 23.)  However, he stated that the "intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (R. at 23.)

He then discussed how the record did not provide evidence that she attended the special education classes while in high school, to which she testified.   (R. at 23.) Moreover, he highlights that in her Disability Report her "friend" reported she did not attend special education classes. (R. at 23.) Furthermore, he indicated that although Ms. Wilson did not graduate from high school, she did complete the twelfth grade, she has five children with one on the way and her testimony regarding her work ability was inconsistent.  (R. at 23.)

The ALJ afforded great weight to the medical opinion of Dr. Vandivier, who indicated that Ms. Wilson functioned at a level higher than she presented and her test scores indicated. (R. at 23).  The ALJ stated that Dr. Vandivier's inability to provide a finding is consistent with Ms. Wilson's testimony of being able to work even though she is applying for Social Security Benefits.  (R. at 23.)

He further concluded that although the Medical-Vocational Rules as a framework supports a finding that the claimant is not disabled and can work at a medium level, Ms. Wilson has limitations that "prevent her from performing all or substantially all of the requirements of this level of work." (R. at 23). He relied on the VE's testimony that a person with Ms. Wilson's age, education, work experience, and RFC of medium and light levels would be able to perform the requirements of representative unskilled occupations in the State of Indiana.  (R. at 23.)

These occupations include a dishwasher, laundry worker, and a landscaper at the medium level and a housekeeper, packer, and patch worker at the light level.  (R. at 23.)

**B.      Analysis**

Ms. Wilson asserts that the ALJ's decision failed to fully and fairly develop the record, relied on inconsistent evidence and ignored an entire line of evidence.  (Pl. Br. at 9.)  She argues that this inadequate analysis of her severe impairment of mental retardation was therefore erroneous and the case should be remanded in light of it.  *Id.*  The Court agrees.

**1.      ALJ failed to fully and fairly develop the record and used incorrect, inconsistent, and selective evidence as a bases for his decision**

In his decision, the ALJ conducted an inadequate evaluation of Ms. Wilson in accordance with the requirements of Listing 12.05, the Listing for Mental Retardation, found in Appendix one Subpart P., Regulation No. 4. (R. at 20).  He affords "great weight" to the RFC report of Dr. Vandivier though noting with undeviating certainty that the report's findings were inconclusive and therefore invalid.  (R. at 20, 23.)  Additionally, he misreports data from the record.

Although Ms. Wilson's counsel failed to assist in development of the record, it is undisputed that "[i]n Social Security cases, the ALJ has a special duty to develop the record fully and fairly and to ensure that the claimant's interests are considered, even when the claimant is represented by counsel." *Cannon v. Harris*, 651 F.2d 513, 519 (7th Cir. 1981); see also *Smolen v. Chater*, 80 F.3d 1273, 1288 (quoting *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir.1983)) (noting that this duty to fully and fairly develop the record extends to the represented as well as the unrepresented). In *Naydihor v. Sullivan*, 743 F. Supp. 631, 635 (E.D. Wis. 1990) (citing *Cannon v. Harris*, 651 F.2d 513 (7th Cir. 1981)), the court noted, that "administrative proceedings are not adversary hearings, and that the ALJ has an affirmative duty to thoroughly

12

develop the record."   An ALJ's failure to do so "has been consistently held to constitute good cause sufficient to remand to the Secretary under 42 U.S.C. § 405(g) for the taking of additional evidence."   *Cannon*, 651 F.2d at 519. Notably in *Cannon*, while that claimant was not represented by counsel, as is Ms. Wilson in this case, the court stated that even the "Administration's own regulations provide that an assessment of residual functional capacity is required not only with respect to those physical or mental capacities that are in doubt by reason of the claimant's allegations, but also those as to which doubt arises by reason of the evidence adduced." *Id.* at 519.

In his findings, the ALJ cites the conclusions of Dr. Vandivier regarding Ms. Wilson's abilities that were inconsistent with her IQ test scores from her RFC.  The ALJ further noted that the overall findings of Dr. Vandivier were invalid due to the doctor's professed findings of inconsistency within the test and deferred diagnosis.  He, however, proceeded to evaluate Ms. Wilson's claim of disability according to the criteria requirements of Listing 12.05B without providing any additional medical reasoning or citing any other medical reports that informed him of Ms. Wilson's mental abilities. (R. at 20.)  "An ALJ's duty to develop the record further is triggered when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *Mayes v. Massanari*, 276 F.3d 453, 459–60 (9th Cir. 2009) (citing *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir.2001)).

The Commissioner relies on the argument that it is the claimant's burden to provide evidence proving that her impairments meets the criteria for a mental impairment, *Howell v. Sullivan* 950 F.2d 343, 348 (7th Cir. 1991). In *Howell*, the ALJ noted that it was not his responsibility to develop a diagnosis by going on a "fishing expedition" for mental impairments, especially where a claimant is represented by counsel.   This Court recognizes that it is

13

petitioner's duty and burden to prove that she was disabled as the ALJ emphasizes in his decision.  *See* 42 U.S.C. § 423(d)(5); (R. at 20).  It is unfortunate that Ms. Wilson's counsel failed in this regard. However, in this case, there was a diagnosis and the ALJ has noted that the medical evidence within the record is "simply inadequate to determine whether the claimant['s] learning disability meets or equals the criteria of Listing 12.05B", therefore, the ALJ is required to develop the record further.  (R. at 20.)  This type of inadequacy in the ALJ's own findings triggers the ALJ's duty to "conduct an appropriate inquiry." *Smolen*, 80 F.3d at 1288 (discussing the ALJ's invalid rejection of a doctor's report because the ALJ failed to conduct an inquiry into its found inadequacy).

Moreover, not only did the ALJ fail to fully and fairly develop the record with a valid RFC, he selected only a portion of the Ms. Wilson's non-medical SSA Disability Report to bolster the inadequate assessment.  The ALJ stated that Ms. Wilson's "friend" reported that Ms. Wilson did not attend special education classes on page thirty-five of exhibit 1E.  (R. at 23.) However, this document is part of Ms. Wilson's "face-to-face" interview conducted by the interviewer for the Social Security Administration.  In that document, the interviewer specifically stated that Ms. Wilson could not read or write and that "she did not understand other than she was filing for benefits on her daddy's record."  (R. at 96.)  On the actual page the ALJ is referencing, within this same document, it is Ms. Wilson who responded "No" to the question of having attended special education classes. (R. at 103.)  However, the interviewer also remarks

14

further down on the same page of this same document that Ms. Wilson did receive special education classes.[1] (R. at 103.)

The ALJ goes on to discuss how Ms. Wilson has no limitation on her activities of daily living or social functioning. (R. at 21.) Specifically, he points to her ability to care for her children prior to 2005. (R. at 21.) However, the ALJ did not note that Ms. Wilson's sister stated that Ms. Wilson's oldest son was removed from her care because "he was having seizures and losing weight" at the age of three. (R. at 72.) Furthermore, the ALJ did not consider Ms. Wilson's testimony regarding her failed attempts to get her children back due to her inability to work with a "good lawyer" and that they took her youngest child because the others were already in foster care. (R. at 261, 263.) Although a written evaluation of every piece of testimony and evidence is not required, the Secretary must articulate, at some minimum level, his analysis of the evidence in cases in which considerable evidence is presented to counter the agency's position. *Orlando v. Heckler*, 776 F.2d 209, 213 (7th Cir.1985). From this evidence it is difficult to discern whether Ms. Wilson does or does not have limitations on her activities of daily living. The ALJ should have considered this contrary information instead of simply ignoring it. *Anderson v. Astrue*, 2011 WL 4899990, *7 (N.D. Ind. Oct 14, 2011) (citing *Myles v. Astrue*, 582 F.3d 672, 676 (7th Cir.2009)).

### 2. Though required, the ALJ failed to discuss the State Agency Psychiatric Review Technique Form and Medical Advice Report

Petitioner argues the ALJ ignored other medical evidence he is required to consider and address according to the SSA. The ALJ must discuss state agency medical or psychological

---

[1] Considering Ms. Wilson's speculative lack of understanding, due to her professed "learning disability", it is reasonable to believe that she selected "No" regarding special education classes in error because the interviewer notes on the same document that she did in fact participate in special education classes.

15

consultant findings regarding equivalence to a listed impairment.  (SSR 96-5p.)  Neither the

Psychiatric Review Technique conducted by Dr. Neville nor the overall state agency Medical

Advice report that was requested and provided by Dr. Shipley is mentioned anywhere in the

ALJ's decision. The ALJ did not have to adopt these opinions, but he could not ignore them.

*Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010); *Terry v. Astrue*, 580 F.3d 471, 477 (7th

Cir. 2009).

Dr. Neville conducted a Psychiatric Review on July 2, 2007 for the state agency that did

not provide a medical diagnosis due to insufficient evidence. (R. at 135.)  Under 20 C.F.R. §

404.1520(a), which governs the evaluation of mental impairment, an ALJ is no longer required

to complete the Psychiatric Review Technique form, but must include "pertinent findings and

conclusion based on the technique" in the decision. *See* 20 C.F.R. § 416.920a(c). Dr. Neville

reported he lacked Ms. Wilson's school records in order to complete his evaluation for the

PRTF.  (R. at 135.)  These records, however, were made available to the ALJ on May 13, 2007.

(R. at 112.) While the academic data submitted at that time did not reference any mental

impairment or school imposed supplemental education, it did show that Ms. Wilson participated

in the same classes throughout her high school matriculation and earned a GPA of 0.1452. (R. at

112.)  Even so, another report was provided on January 15, 2009 which stated that the Chicago

Public School system had Ms. Wilson listed as "Educable Mentally Handicapp[e]d." (R. at

255B.)  This report was received before the ALJ hearing and over a year prior to the issuance of

his decision.  Yet, the ALJ did not seek another review by Dr. Neville in order to assess whether

this was a pertinent finding.  This is further perplexing considering that Dr. Neville's report

specifically stated how that information was all it lacked for the Psychiatric Review Technique

evaluation. Nevertheless, the ALJ failed to include this medical report by the state agency and its conclusion that it lacked information in his decision.

In addition, the ALJ did not discuss the medical consultant report of Dr. Shipley.  That report emphatically stated that a Psychiatric Review Technique Form and a MRFC were needed because of insufficient evidence. (R. at 113.)  Although, Dr. Shipley affirmed that there was no evidence of psych[ology] issue before July 4, 1994, the date Ms. Wilson turned twenty-two years old, she emphasized that the current testing was invalid and the lacked a diagnosis. (R. at 113.) The report shows no other advice aside from her recommendation for another assessment. (R. at 113). In essence, the ALJ completely disregarded the medical evidence of Dr. Neville and Dr. Shipley even though he is required to consider and address it according to the SSA.

### 3.      The ALJ ignored the evidence provided by Ms. Wilson's treating physicians.

As noted by Ms. Wilson, the medical records she provided holistically discuss regularly scheduled physicals, gynecological exams, and child bearing.  (Pl. Br., Dkt 17 at 3.)  However, they also include notations and observations concerning Ms. Wilson's mental capacity by her attending physician on several occasions.  Although it is completely within the province of the ALJ to disregard these opinions by giving them little or no weight, it is not within his authority to completely ignore them and fail to discuss them. *Groves v. Apfel*, 148 F.3d 809, 811 (7th Cir. 1998).  In *Groves*, the Seventh Circuit held that the failure to even mention the opinion of competent medical evidence though contrary to state agency evidence "makes the ALJ explanation for denying benefits unacceptable." *Id.* at 813.

On July 31, 2003, Dr. Weeks stated that Ms. Wilson was seemingly mentally retarded. (R. at 156.)  On August 10, 2004, Dr. Mamlin also noted that she deemed her mentally retarded. (R. at 155.)   Ms. Wilson, as she had done on prior occasions, was again attempting to have her

17

SSI benefits placed in her name during her August 10, 2004 visit. (R. at 155.)  Dr. Mamlin expressed great reluctance in adhering to her request due to Ms. Wilson's inability to correctly answer the hypothetical change question.  (R. at 155.)  Then on December 14, 2004, when she brought her mother to acquiesce to the SSI benefit change, Dr. Mamlin noted that both Ms. Wilson and her mother were mentally challenged.  (R. at 154.) Ms. Wilson was also labeled "mentally challenged" on June 16, 2005 by Dr. Shelton-Graff and as a "mentally retarded woman" on August 29, 2006 again by Dr. Mamlin.  (R. at 151, 166.) The ALJ does not mention these notations which are contrary to the visual assessment of Dr. Vandivier.  Instead, the ALJ afforded "great weight" to  Dr. Vandivier's medical opinion that Ms. Wilson had the ability to perform higher than her test scores indicated, and made no mention of these other medical professionals or their observations. (R. at 23.) Arguably, the ALJ could have concluded that assessing Ms. Wilson's mental abilities was outside of those various doctors expertise or invaded his domain of deciding if she was mentally impaired.  Indeed, even if all of Ms. Wilson's doctors' conclusions were outside of their medical area of expertise or exclusively within the Commissioner's domain, the report could not be overlooked on that basis alone.  *See* SSR 96–5p ("[O]pinions from any medical source on issues reserved to the Commissioner must never be ignored."); *see also*, *Wyatt v. Astrue*, 2012 WL 2358149 at *5 (S.D. Ind. June 20, 2012) (noting that the ALJ is required to articulate his reason for accepting or rejecting evidence).

Furthermore, the ALJ points out that Dr. Vandivier deemed the inconsistency in his visual assessment of Ms. Wilson's abilities and her actual IQ scores, which were significantly below average, was due to Ms. Wilson's questionable effort on the IQ exam.  (R. at 20.)  In light of the ocular perception of Ms. Wilson's treating physicians that surmised she is mentally retarded, that questionable effort could be attributable to her mental impairment, in which Dr.

18

Vandivier chose not to believe. A treating physician's opinion concerning the nature and severity of a claimant's injuries receives controlling weight only when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "consistent with substantial evidence in the record." 20 C.F.R. § 404.1527(d)(2); *see also Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004). The treating physician's opinion is important because that doctor has been able to observe the claimant over an extended period of time, but it may also be unreliable if the doctor is sympathetic with the patient and thus "too quickly find[s] disability." *Stephens v. Heckler*, 766 F.2d 284, 289 (7th Cir. 1985). Accordingly, if the treating physician's opinion is inconsistent with the consulting physician's opinion, internally inconsistent, or based solely on the patient's subjective complaints, the ALJ may discount it as long as he "minimally articulate[s] his reasons for crediting or rejecting evidence of disability." *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000); *see White v. Barnhart*, 415 F.3d 654, 659 (7th Cir. 2005); *Skarbek,* 390 F.3d at 503.

Both Dr. Vandivier and the ALJ place emphasis on the fact that Ms. Wilson believes she can function normally and find work as noted in the Dr. Vandivier's psychological evaluation and in the ALJ's decision. (R. at 21, 117.) Yet, Dr. Vandivier's actual objective test results for Ms. Wilson show some mental impairment. Additionally, Ms. Wilson's treating physicians' state on several occasions that she is mentally impaired based on their visual assessments. Because of this inconsistency, the Court finds that the ALJ erred by choosing to give controlling weight to the medically unsubstantiated opinion of Dr. Vandivier. Moreover, this conclusion is supported by the ALJ's decision to ignore Ms. Wilson's treating physician's reports or at minimum to even articulate what weight he gave the report in making his decision.

19

Ultimately, the ALJ conducted an inadequate evaluation of Ms. Wilson. He afforded "great weight" to findings that were inconclusive and therefore invalid. Additionally, he misreported data from the record and failed to mention numerous other medical and nonmedical evaluations that would have provided him with additional information to properly assess her mental aptitude.

### 4. New Evidence

Lastly, Ms. Wilson contends that the psychological assessment conducted by Dr. Smith actually provides for valid findings and a diagnosis regarding her mental condition. This assessment, however, was not presented to the ALJ at the time of the hearing because it was not completed until a year after the hearing and the ALJ's decision.  Because the Appeals Council subsequently refused Ms. Wilson's request to review the ALJ's decision, it is inappropriate for the Court to consider evidence which was not before the ALJ.  *See* 42 U.S.C. § 405(g); *Eads v. Sec. of Dep't of Health & Human Servs.*, 983 F.2d 815, 817 (7th Cir. 1993).

The Commissioner also contends that this new evidence should not be considered because it is immaterial, it is not new, and it does not qualify for a sentence six remand.  *See* 42 U.S.C. § 405.  Furthermore, the Commissioner states that since this issue was not argued, the issue is waived.  (Resp. Br., Dkt 20 at 9); *United States v. Vargas-Garnica*, 332 F. 3d 471, 474 n.1 (7th Cir. 2004) ("Arguments not raised in a party's opening brief are waived").  However, the Court has already concluded that the ALJ's decision must be remanded for further proceedings. Thus, it is unnecessary to consider whether Ms. Wilson's new evidence would merit remand on its own. Accordingly, this opinion does not preclude the consideration of such evidence on remand.  *See Campbell v. Shalala*, 988 F.2d 741, 745 (7th Cir. 1993) (ordering consideration of

new evidence on remand for lack of substantial evidence supporting ALJ's decision, even though

court concluded in dicta that new evidence would not itself justify remand).

## IV.   CONCLUSION

For the reasons set forth above, this decision of the Commissioner of Social Security in

this case is **REMANDED** for further proceedings consistent with this opinion.

SO ORDERED.   07/24/2012

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Charles D. Hankey
charleshankey@hankeylawoffice.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov